## Case No. 5,448.

### GILMORE v. NORTH AMERICAN LAND CO. et al.

[Pet. C. C. 460.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1817.

FRAUDULENT CONVEYANCES — INTENT — PRESUMPTION—PURCHASER UNDER EXECUTION AGAINST PARTNER.

1. A conveyance is fraudulent, under St. 13 Eliz. c. 5, when the same is voluntarily made by the owner of the land, if land be conveyed, the grantor being indebted at the time it was executed; the conveyance must be made with intent to delay, hinder, and defraud creditors or others.

[Cited in McKee v. Jones, 6 Pa. St. 427.]
[Cited in Willis v. Whitsitt (Tex. Sup.) 4 S. W. 256.]

2. A fraudulent intent will in general be presumed, from the fact that the party conveying

[1] [Reported by Richard Peters, Jr., Esq.]

was indebted at the time the conveyance was executed.

[Cited in Heath v. Page, 63 Pa. St. 119.]

[Quoted in Briscoe v. Bronaugh, 1 Tex. 326.]

3. A purchaser under an execution against one partner, becomes a tenant in common with the other partners, in an undivided share of the land purchased, subject to all the rights of the other partners. Until the partnership debts are paid, he can have no claim, but on the separate interest of the individual partner in the residue.

[Cited in Re Corbett, Case No. 3,220.]

[Cited in Newhall v. Buckingham, 14 Ill. 408.]

In equity.

WASHINGTON, Circuit Justice. This is a bill in equity, filed by a purchaser of the lands in question under an execution against Robert Morris, in 1797, in order to set aside certain articles of agreement, bearing date the 20th of February 1795, entered into between the said Robert Morris, John Nicholson, and James Greenleaf; and to obtain a conveyance of the property, so purchased, from the defendants, the trustees of the North American Land Company, in whom the legal estate became vested by grants from the state of Pennsylvania subsequent to the plaintiff's purchase.

The material parts of the case appear from the bill, answer, and exhibits, to be as follows: On the 10th of December, 1793, the before named gentlemen, R. Morris, J. Nicholson, and J. Greenleaf, entered into articles of copartnership for the purchase and sale of large tracts of land in Pennsylvania, and elsewhere in the United States, for the joint account and risk, and for the equal benefit of the partners; to continue for five years certain, or for a longer time if the parties should consent. The purchases were to be made by Morris and Nicholson for the account of the company; and not only the lands so to be purchased, but other tracts to a great amount then owned by Morris and Nicholson, were to become the joint stock of the copartnership; Greenleaf paying cash to the other partners for one-third of the said lands. The legal titles in the said lands thus purchased, and to be purchased, were to be vested in such persons as the partners or a majority of them should appoint, and to be conveyed by them to persons who should be willing to buy the same, or to advance money on them. Neither party was permitted to purchase lands on his own separate account, so as to interfere with the objects of the company. The clear profits which should be made upon these purchases and sales, were to be equally divided, from time to time, between the partners. On the 13th of January, 1794, Morris and Nicholson entered into an agreement with Thomas Stokely and John Hoge, by which the former bound themselves to purchase from the state of Pennsylvania, warrants for 120,000 acres of land, between the Ohio and Alleghany rivers, and the northern limits of the said Stokely's district, which warrants were to be surveyed by the said Stokely and Hoge, in their districts or elsewhere, and the purchase money for the said warrants, as well as the office fees and expenses of making the surveys, were to be paid by Morris and Nicholson. Stokely and Hoge to receive as a compensation for their trouble in locating and surveying the lands, one equal third part of the whole quantity. These are the lands which form the subject of this suit. On the 20th of February, 1795, the agreement which this bill seeks to set aside, was entered into between Morris, Nicholson and Greenleaf, for forming a company to be called the North American Land Company. By this agreement, 647,046 acres of the lands belonging to the copartnership of Morris, Nicholson and Co. lying in the state of Pennsylvania, of which the lands in dispute are a part, as well as other large quantities of lands belonging to those partners, amounting in the whole to about 6,000,000 of acres, were to constitute the capital of the said land company. These lands, valued by the parties at fifty cents an acre, were to be divided into 30,000 shares, at 100 dollars a share; at which price the partners, by the said agreement were to sell the said lands in the first instance, the legal titles to the same to be vested in certain trustees, and by them to be conveyed to those who should become purchasers, and the fruits of the sales to be for the use of the share holders in proportion to their respective interests. Each owner of a share, so long as he held it, was to become a member of the company and entitled to vote for the members of the board of managers, by whom all the affairs of the company were to be conducted. The company to continue to exist for fifteen years, and the dividends to be made amongst the stockholders annually. This agreement professes to be made by Morris, Nicholson and Greenleaf, with those who should thereafter become purchasers, owners, or holders of shares in the company; and it is agreed, both by the bill and answer, that no conveyance of the land in dispute, other than these articles, was at any time made by Morris, Nicholson and Greenleaf to the trustees named in that agreement. On the 28th of May, 1796, an agreement was entered into between James Greenleaf of the one part, and Robert Morris and John Nicholson of the other, by which the former agreed to sell to the latter, as tenants in common, his interest in the above land company, for a large sum of money, to be secured upon the shares of the said Greenleaf in the said property, which were not to be transferred till the purchase money should be paid. The answer states that no part has been paid. It appears that many shares in this company were disposed of; but it is quite uncertain, from the bill, answer and exhibits, what is the real condition of the company's affairs at this time, and whether there will be any and what profits to divide amongst the members

of it, after all the partnership debts are discharged. On the 23d of November, 1797, Parish and Co. obtained a judgment at law in this court against Robert Morris, for upwards of nineteen thousand dollars, and under a fieri facias and venditioni exponas, issued on that judgment, the tracts of land mentioned in the bill were levied upon, sold as the property of Robert Morris, and purchased by the complainant. For these tracts, or a part of them, patents have been obtained by the defendant James Greenleaf, who has conveyed the same to the trustees under the articles of the 20th of February, 1795. The bill charges, that the lands in question were the property of Robert Morris, or of Morris and Nicholson, and were paid for by him or them; and that at the time when the articles of the 20th of February, 1795, were entered into, Robert Morris, John Nicholson, and James Greenleaf, were insolvent or greatly indebted, and that they entered into those articles with intent to delay, hinder, and defraud their creditors. The answer of the defendants, James Greenleaf and the managers of the North American Land Company, denies that Morris, Nicholson and Greenleaf, or either of them, were insolvent at the time stated in the bill, but it admits that they were largely indebted. They deny that the purchase money for the warrants for the land in question was paid by Robert Morris, but assert positively, that it was paid by John Nicholson. The answers deny generally that Robert Morris had any right or title to these lands, except such equitable interest as the articles of the 10th of December, 1793, and the 20th of February, 1795, conferred upon him.

The first question to be decided in this stage of the cause is, whether the complainant is entitled to the relief specifically asked for? And if not, then, secondly, is he entitled to any other, and what relief, under the general prayer of the bill? The only ground upon which the claim of a conveyance of the legal estate in the property in question is or can be placed, is, that the ownership in it was vested in Robert Morris on the 20th of February, 1795, and that the articles entered into on that day were fraudulent, as to the creditors, and therefore void under St. 13 Eliz. c. 5. To bring a case within this statute, the conveyance must be voluntary; it must be made by the owner of the land, (if land be the subject in dispute,) he being at the time indebted; and the conveyance must be made with intent to delay, hinder, and defraud creditors or others of their just and lawful actions, &c. In general, the intent will be presumed from the circumstance of the party conveying being indebted. Where these circumstances concur, there is no doubt but that the conveyance is void as well in respect to subsequent as to prior creditors. It is admitted by the answers, that Robert Morris was largely indebted on the 20th of February, 1795, when the agreement which is the object of this bill to set aside was made; and if this agreement deserves to be called a conveyance to delay and defraud creditors, within the meaning of the statute (a point not necessary to be decided in this cause), it still remains to be shown, that Robert Morris was at that period the owner of the land in dispute. The agreement of the 10th of December, 1793, constituted Robert Morris and John Nicholson trustees of all the lands which they should thereafter purchase within the scope of that agreement, for the company of Morris, Nicholson and Greenleaf. As to Robert Morris, in his individual capacity, the purchase did not vest in him even an equitable estate; since the answer (responsive to a direct allegation and interrogatory in the bill) states that the purchase money for the warrants was paid by John Nicholson. Robert Morris had no title whatever to these lands, except such as he derived under the agreements of 1793 and 1795, as a partner in the firm of Morris, Nicholson and Greenleaf. Here it is that the foundation of the complainant's bill as to his special prayer, fails him. The articles of the 20th February, 1795, did not operate upon the separate estate of Robert Morris, but on the partnership property of Morris, Nicholson and Greenleaf. Robert Morris by virtue of these articles acquired an equitable interest in one undivided third part of the land in question, but he parted with nothing. To set aside that agreement therefore, might injure the complainant, but it could not possibly do him a benefit.

Second. The next question is, whether the complainant is entitled to any, and what remedy under the general prayer of his bill? Upon this point there is no difficulty. By the purchase of the complainant under the execution against Robert Morris in his separate capacity, the former became at law a tenant in common with the other partners in one undivided third part of the land which he purchased. The marshal had no power to sell a greater interest than that in the land levied upon, and if a timely application had been made to this court on its law side, he would have been so directed. But the purchaser holds the property so purchased subject to all the rights of the other partners. In equity more especially, he stands in the place of the partner under whom he claims, subject to the partnership accounts. Until the partnership debts are paid, he can have no claim but upon the separate interest of the individual partner of the residue which may then remain. Upon these principles, the complainant is entitled to an account, if he desires it, and the court will so decree.

---

GILMOUR (MINGE v.). See Case No. 9,-631.

GILMOUR (UNITED STATES v.). See Case No. 15,208.